UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-20300-CR-MOORE/TORRES

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

TAVON GRAHAM,

    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

This matter is before the Court on Defendant's Motion to Suppress Physical Evidence ("Motion"). [D.E. 19]. The Court has reviewed the Motion, the Government's response in opposition [D.E. 21] and Defendant's supplemental memorandum [D.E. 25]. The Court held an evidentiary hearing regarding this Motion on June 13, 2011. For the following reasons, Defendant's Motion should be **DENIED**.

### *I. BACKGROUND*

On April 22, 2011, Defendant was indicted for one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). [D.E. 1]. Defendant moves to suppress the two recovered firearms and his post-arrest statements as "fruit[s] of [an] unlawful stop" in violation of the Fourth Amendment to the United States Constitution. Defendant contends the physical evidence ought to be suppressed for two related reasons. First, Defendant was detained without reasonable suspicion of criminal activity in violation of *Terry v. Ohio*, 392 U.S. 1 (1968). Second, assuming

*arguendo* that reasonable suspicion existed to detain him, Defendant contends there was no reasonable suspicion that he was armed to warrant a subsequent frisk. We rest our decision on the following facts presented during the June 13, 2011 hearing.

## *II. FINDINGS OF FACT*

On November 17, 2010, at approximately 8:10 p.m. and after sundown, a caravan of approximately four unmarked police vehicles carrying approximately twenty agents converged on a group of individuals congregating in a residential area of Little Haiti in Miami, Florida. More specifically, the caravan was directed to the corner of Northwest 58th Street and Northwest 5th Court. The agents were part of a joint gang task force that included federal agents from the Department of Homeland Security ("DHS") along with local Miami-Dade county and city police officers (collectively "agents").

The purpose of the task force was to conduct a gang identification sweep of the subject area. Thus, the agents were not responding to a specific call. In fact, the agents had no particular information of any active criminal activity in the area. Moreover, the agents had no specific information with respect to any of the individuals. Importantly however, during the hearing, it was established that this is a "high crime area."[1]

---

[1] Detective Reinaldo Goyos ("Detective Goyos") participated in the sweep that evening. He testified to patrolling Little Haiti for approximately 18 months and is familiar with its criminal activity. He explained that this area is characterized by heavy gang and narcotics activity, drug use generally, frequent shootings, assaults and aggravated batteries. Moreover, Detective Goyos has personally made arrests in the area and concludes, based on his experience, it is a top crime area of Miami.

The agents received notice that approximately six to ten individuals were standing on the subject corner. Two of the caravan vehicles approached the corner from a northerly direction, made a right-hand turn and then stopped in front of this group. Immediately upon arrival, both before and after the agents exited their vehicles, a portion of the group fled in an easterly direction.[2] Upon exiting his vehicle, DHS's Special Agent Mark Thomas ("Agent Thomas"), as well as other agents, recognized an odor of marijuana emanating from the group. While several agents made chase, Agent Thomas remained behind to tend to three individuals who did not engage in "headlong" flight.

After Agent Thomas exited his vehicle, he raised his M-4 assault rifle and commanded these individuals to "Stop. Police. Stop." Two of them immediately complied and laid on the ground. However, Defendant hesitated. Instead, and contemporaneously with Agent Thomas' commands, Defendant looked to his right (towards Agent Thomas, making eye contact), then to his left (towards his fleeing cohorts), back to his right and then took "two or three steps" to the left before complying with Agent Thomas' command to lay down. Thus, unlike his remaining cohorts, Defendant's particular response to Agent Thomas raised suspicions and an objective intent to flee.

For approximately five minutes, Agent Thomas secured Defendant and the two others at gun point until additional agents returned from the chase to assist him.

---

[2] Because the agents anticipated a large group of individuals and their "flight," the remaining vehicles and agents were set up in a parameter around the block.

During this brief period, Defendant asked Agent Thomas if he could either "get up" or "sit up" two or three times. Based on Defendant's initial movements and these requests to "get up," Agent Thomas, in part, based on his twenty-nine years of law enforcement experience, testified that he specifically focused his attention on the Defendant because he "drew the greatest amount of suspicion from me."

Special Agents Phillip Mederos, Nicole Mederos, Geoffrey Goodwin and Detective Goyos returned to assist Agent Thomas. Agent Thomas informed the agents that Defendant and the other two cohorts had not been searched for weapons. Defendant wore a baggy black tee shirt, untucked over his black jeans obscuring any potential weapon bulge in his clothes. At this time, though suspicious of him, Agent Thomas had no objective reason to believe that Defendant possessed a firearm. Nevertheless, agents conducted a protective weapons pat-down on all three individuals. Special Agent Phillip Mederos conducted a pat down frisk of Defendant, felt a bulge, then lifted his shirt to reveal a visible firearm sticking out of his right rear pocket. Defendant was then handcuffed and rolled to his side to continue the search. Special Agent Nicole Mederos conducted a pat-down frisk of his front and lifted his shirt revealing a second visible firearm in his front right pocket. No other contraband was found on Defendant.

Thereafter, Defendant was identified as a convicted felon. Special Agent Goodwin read Defendant his *Miranda* rights from a preprinted card and, after Defendant acknowledged and waived his rights, he conducted a videotaped interview of Defendant. During this interview, Defendant made incriminating statements.

## *III.  ANALYSIS*

The Fourth Amendment protects individuals from unreasonable searches and seizures. *See* U.S. Const. amend IV.  Consistent with Fourth Amendment principles, an officer "may conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). Reasonable suspicion is "a particularized and objective basis" for suspecting the person stopped of criminal activity. *United States v. Cortez,* 449 U.S. 411, 417-18 (1981).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123. The officer conducting the stop "must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24 (quoting *Terry,* 392 U.S. at 27).

In determining whether a reasonable suspicion existed, courts consider the totality of the circumstances. *United States v. Sokolow,* 490 U.S. 1, 8 (1989).  "This process allows officers to draw on thier own experience and specialized training to make inferences and deductions about the cumulative information available to them that might elude an untrained person." *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (citations and internal quotations omitted).   This analytical process

5

entails making a practical determination and reaching "a common sense conclusion" based on "probabilities" and not "hard certainties." *Cortez*, 449 U.S. at 418.

Further, in connection with a *Terry* stop, an officer may conduct a pat-down search if he has reason to believe that his own safety or the safety of others is at risk. *See United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (citing *Terry*, 392 U.S. at 27). "The officer need not be *absolutely certain* that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted to belief that his safety or that of others was in danger." *Id.* at 1202-03 (citations omitted, emphasis in original). Ultimately, the burden rests with the government to prove the reasonableness of the officer's suspicion. *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir.1998).

Based on the totality of the circumstances, we conclude that the agents had reasonable suspicion to both detain Defendant and conduct a subsequent protective weapons pat-down. The salient objective facts supporting this conclusion are: 1) Defendant was located in a "high crime area;" an area known for shootings, gang and narcotic activity; 2) Defendant initiated flight manifested by furtive fight or flight eye movements and took "two or three" steps away from Agent Thomas; 3) that subsequent to his "flight," Defendant's repeated requests to "get up" elicited increased suspicions from Agent Thomas; and, 4) Defendant wore baggy clothes that could conceal a weapon.[3] *See Wardlow*, 528 U.S. at 123-25 (holding that an individual's presence in

---

[3] Moreover, while we gave these facts less credence, our conclusion would be bolstered by the fact it was dark; the agents smelled marijuana; and, Defendant's

6

a high crime area, when coupled with unprovoked flight and nervousness, viewed together, gave officers reasonable suspicion to detain and search); *United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000) (the fact that defendant's eyes "lit up," he moved quickly towards his car and then drove away – standing alone – are insufficient; however, when considered with officer's knowledge of high crime area, the court found reasonable suspicion to detain and search); *see also Bryan v. Spillman*, 217 Fed. App'x 882, 885 (11th Cir. 2007) (independent of suspect's consent, court concluded officer had reasonable suspicion to conduct a *Terry* protective weapons pat-down because, among other things, officer smelled marijuana and suspect wore baggy clothes that could conceal a weapon).

Ultimately, Defendant cannot escape the factual similarities between *Wardlow* and his case. In *Wardlow*, the officers were driving the last car of a four car caravan converging on a Chicago neighborhood known for heavy narcotics trafficking [deemed a "high crime area"] in order to investigate drug transactions. The officers were traveling together because they expected to find a large group. As the caravan passed one building, an officer noticed the defendant standing next to a building holding an opaque bag. The defendant looked in the direction of the officers and then fled down an alley. The officers eventually cornered the defendant on the street. An officer immediately conducted a protective weapons pat-down, relying on his experience that

---

cohorts fled thus provoking an immediate and heightened response from agents.

weapons were often found in the vicinity of narcotics transactions. The officer discovered a firearm. *Wardlow*, 528 U.S. at 121-22.

In *Wardlow*, the Supreme Court held that a defendant's evasive and unprovoked flight, along with his presence in a high-crime area, aroused sufficient, reasonable suspicion to lawfully stop the individual and conduct a pat-down. *Id.* at 124. The court further noted that even where all of the suspect's conduct is lawful, if the conduct is ambiguous and susceptible to an innocent explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to "resolve the ambiguity." *Id.* at 125. Thus, *Wardlow* gives significant weight to the presence of both "unprovoked flight" and a "high crime area." As a consequence, the presence of these factors alone hardly constitutes the "narrowly drawn authority" that *Terry* envisioned. 392 U.S. at 27. To the contrary, portions of many urban areas, now no longer require an officer to have the "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez,* 449 U.S. at 417-18.

This case proves the point. Though we find that Defendant falls within the expanded umbrella that *Wardlow* provides, the record shows that two individuals also present at the street corner who did not exhibit any indication of flight or suspicion, beyond their presence at that same corner, were also seized and searched just like the others who had engaged in suspicious behavior. Indeed, as the officers candidly conceded at the hearing, the plan all along was to confront, investigate and search any person they encountered.

8

Nevertheless, the ultimate similarities between *Wardlow* and the Defendant remain undeniable. We are bound by *Wardlow*. The only safeguard the Court can apply in such a case is to require the government to show, with objective and demonstrable facts, that the *Wardlow* expansion of *Terry* is warranted. The government bears the burden of demonstrating that a particular location is in fact known to have a heavy narcotics trafficking or violent history, as compared with any other part of a large metropolitan area. A supposition or stereotype is not enough. The government must be able to show that the particular location targeted indeed justified the level of intrusion permitted by *Wardlow* and rendered the officers' actions in that event reasonable and justifiable under the Fourth Amendment.

Here, in part through the Court's questioning and the Defendant's witnesses who had personal knowledge of the unique and repeated problems and history of that particular street corner, the record satisfies the government's burden of showing that this location is indeed a "high crime area" for *Wardlow* purposes. Agents converged on a large group of men located at night in that a "high crime area." Upon making eye contact with Agent Thomas, Defendant initiated unprovoked "flight" only to reconsider in light of Agent Thomas' commands and (in all likelihood) the presence of his M-4 assault rifle. Then, Defendant's conduct raised further suspicions which, based on Agent Thomas's experienced, warranted a protective weapons pat-down. These facts in their totality bring this case under the umbrella of *Wardlow*. At a very minimum, it was objectively reasonable based on the totality of circumstances for the agents to

9

detain Defendant to "resolve the ambiguity" regarding his involvement in criminal activity. *Id.* at 125 (citing *Terry*, 392 U.S. at 30).

Admittedly, however, differences do lie in the details. But, they are inconsequential and equate to differences without constitutional distinctions. For instance, Defendant did not engage in "headlong" flight. *See Wardlow*; *Gordon*. However, courts have found "flight" with much less. *See, e.g., United States v. Reed*, 402 Fed. App'x 413, 417 (11th Cir. 2010) ("furtive flight or fight eye movements" indicating an intent to merely hid something, without any actual "flight," was sufficient to permit a *Terry* frisk); *Hunter*, 291 F.3d at 1306 (walking, rather than running, was deemed "flight"). Indeed, the Eleventh Circuit has clearly opined that the speed of the defendant's movements may be relevant in the totality of the circumstances, but the speed of the movement itself is not dispositive. *See Gordon*, 231 F.3d at 757. Thus, the argument that Defendant did not "flee" because his flight was less than "headlong" is unsupported. Moreover, the record belies that conclusion because Defendant's flight-esque actions clearly provided the requisite reasonable suspicion to conduct a *Wardlow* stop and protective weapons pat-down.

Even assuming *arguendo* that Defendant indeed did not flee, we would still conclude that a reasonably prudent officer, under the totality of the circumstances, objectively had reasonable suspicion to conduct a *Wardlow* stop and protective weapons pat-down of Defendant. Without question, several of Defendant's cohorts fled upon the agents' arrival. Some agents made chase, but returned to assist Agent Thomas after

these individuals *outran* them.  Thus, at this moment, it is foreseeable that the agents were in a heightened state of danger with various suspects (at least momentarily) "at large" and thus posing a safety risk.  We find that the inherent confusion such a situation creates is precisely the ambiguity that *Wardlow* seeks to resolve.  Indeed, to find otherwise would impose an onerous burden on the agents and could even subject them to undue danger.  Logically, *Wardlow* should permit agents to "resolve the ambiguity" relating to a non-fleeing defendant so that they may safely focus their efforts on other potential suspects. *See, e.g., Copeland v. Florida*, 756 So. 2d 180, 181 (Fla. 2d DCA 2000) (defendant did not flee but his cohorts did; court found officer had reasonable suspicion under *Wardlow* to conduct a *Terry* stop and search).

Also, the agents did not observe Defendant with, for instance, an "opaque" bag to suggest narcotics sales or other "criminal activity."  However, under the totality of the circumstances, the agents had reasonable suspicion based on Defendant's actions to conduct a protective weapons pat-down without this additional indicia of criminal activity. Regardless, as mentioned, agents described smelling marijuana upon exiting their vehicles.  Thus, even assuming *arguendo* that this factor was necessary, we could have relied on the marijuana to bolster our conclusion. *See, e.g., White*, 593 F.3d at 1203 (marijuana smell is a factor supporting reasonable suspicion).[4]  In sum, while the

---

[4] However, we decided not to rely on the marijuana in reaching our conclusion because, unlike *White*, Defendant was standing on a corner rather than sitting in a vehicle.  Thus, the circumstantial evidence linking the marijuana to Defendant is significantly diminished.  Indeed, Defendant is standing in a "high crime area" known for heavy narcotics activity, which belies the immediate conclusion that Defendant was the individual smoking marijuana.  This, coupled with the fact that he was in a group

facts here are not on all fours with *Wardlow*, they are sufficiently analogous to support our conclusion.

But, Defendant maintains that the agents lacked reasonable suspicion to detain and subsequently conduct a protective weapons pat-down. Defendant relies on *United States v. Marcelino*, 736 F. Supp. 2d 1343 (N.D. Ga. 2010), to support his position. In *Marcelino*, agents were working in a multi-agency gang unit. While looking for gang activity, agents stopped defendant because he was walking through a high crime area, wearing baggy clothing that the agent believed might be gang attire. When the agents attempted to stop the defendant and another individual by calling out "hey amigo" or "hola amigo," the defendant turned away and started to walk in the opposite direction. The agent then said "policia" and instructed the defendant to stop. Instead, the defendant looked over his should and began to walk faster. At this point, the agent told defendant to stop and after a subsequent search discovered a firearm. *Id.* at 1345-47. Ultimately, the court applied *Wardlow* and granted defendant's motion to suppress concluding that a defendant wearing baggy pants in a high crime – without a corresponding finding of "flight" – did not give the officers reasonable suspicion to conduct a *Terry* stop and protective weapons pat-down. *Id.* at 1349-51.

---

and no marijuana was actually found on Defendant further diminishes the relevancy of the marijuana smell. Alternatively, had the agents observed Defendant or his cohorts smoking marijuana this factor would certainly be relevant. *See United States v. Salter*, 255 Fed. App'x 355, 359-60 (11th Cir. 2007) (fact that officer smelled alcohol and observed defendant holding an open container contributed to officer's reasonable suspicion of criminal activity under the totality of the circumstances).

*Marcelino* is not comparable with the record here. Importantly, we find Defendant's eye contact with Agent Thomas, furtive body movements, and "two or three" steps away equate to Defendant "initiating flight" thus satisfying *Wardlow's* vital prong. Moreover, Agent Thomas testified that Defendant further raised his suspicions by requesting to "sit up" or "get up" repeatedly. These factors, coupled with the fact that they were indeed in a proven "high crime area" at night, the Defendant wore baggy clothes, and a portion of his cohorts fled, we find that the agents demonstrate an "articulable" and "objective justification" for an investigatory stop that was otherwise missing in *Marcelino*. Hence, *Marcelino* is inapposite. Accordingly, the agents had reasonable suspicion to detain and conduct a protective weapons pat-down of Defendant.

Finally, based on our foregoing conclusion, we also find Defendant's subsequent arrest as a felon in possession of a firearm was supported by probable cause. Thereafter, Agent Goodwin read Defendant his *Miranda* rights and then Defendant gave post-arrest statements to the agents. Thus, Defendant's argument with respect to suppressing these statements is without merit. *See Gordon*, 231 F.3d at 759 (affirming district court's order that when viewing the circumstances in their totality, there was probably cause to arrest and the defendant's post-arrest statements were properly obtained).

13

## *IV.   CONCLUSION*

Under a post-*Wardlow* legal framework, the agents had reasonable suspicion under the totality of the circumstances to conduct an investigative stop and subsequent protective weapons pat-down to "resolve the ambiguity" relating to Defendant's potential criminal activity. Accordingly, Defendant's Motion to Suppress should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have until **June 20, 2011** to serve and file written objections, if any, with the Honorable K. Michael Moore, United States District Judge. The Court finds good cause to expedite the objection period in light of the imminent trial date. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 16th day of June, 2011.

                                        */s/ Edwin G. Torres*
                                        EDWIN G. TORRES
                                        United States Magistrate Judge